UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF KENTUCKY
SOUTHERN DIVISION
LONDON

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | |
| | ) | |
| Plaintiff, | ) | Criminal No. 12-15-GFVT |
| | ) | |
| V. | ) | |
| | ) | |
| DAVID JASON JENKINS and | ) | **MEMORANDUM OPINION** |
| ANTHONY RAY JENKINS, | ) | **&** |
| | ) | **ORDER** |
| Defendants. | ) | |
| | ) | |

*** *** *** ***

Though it would be an exceedingly rare occurrence for any person to physically assault

another without as much as a fleeting trace of hate in his or her heart, Congress has seen fit to

provide special federal protections against designated "hate crimes." The United States alleges

that when David Jenkins and Anthony Jenkins kidnapped Michael Pennington and assaulted him,

they did so on the basis of Pennington's sexual orientation in violation of, among other crimes,

18 U.S.C. § 249(a)(2), the Matthew Shepherd and James Bird Hate Crime Prevention Act

("HCPA").

The Jenkinses believe this law violates the United States Constitution.  As a preliminary

matter, they believe that federal jurisdiction here cannot rest on the Commerce Clause.[1]  If it

does, they contend that § 249(a)(2) of the HCPA violates the equal protection and substantive

due process components of the Fifth Amendment; the First Amendment prohibition against

---

[1] To be precise, the Commerce Clause issue implicitly arose out of a separate motion by the Jenkinses, and at a
hearing on that issue, a specific oral motion was made that challenged the constitutionality of the HCPA on
Commerce Clause grounds.

vague and overbroad statutes; and, by charging the Jenkinses with kidnapping, they have been

unconstitutionally placed in jeopardy twice for the same criminal event.  For the reasons that

follow, the Jenkinses' Motions to Dismiss will be denied. [2]

## I.

According to the Government, on a spring night in 2011, Anthony and David Jenkins

made plans to kidnap and assault Kevin Pennington because they knew him to be a homosexual.

They solicited assistance of Mable Ashley Jenkins and Alexis Leeann Jenkins to lure Pennington

from his home under the false pretense of accompanying them to obtain drugs.  They led him

into Anthony Jenkins's new white pick-up truck wherein the Jenkinses had obscured the light

and used clothing to conceal their identity so that Pennington, who might have had reason to

recognize their intentions, did not know of their presence.

The group traveled on U.S. Highway 119 toward Kingdom Come State Park.  In transit,

Pennington realized that the defendants were in the car, but despite his requests, he was

prevented from exiting the vehicle.  Pursuant to the plan, the Jenkinses drove Pennington to a

secluded area of Kingdom Come State Park, where they restrained and "brutally beat Pennington

while yelling anti-homosexual comments."  [R. 70 at 3].

Fortunately, Pennington escaped from the attack and alerted local law enforcement

officials.  The Jenkinses were ultimately arrested and charged with the attempted murder of

Pennington.  The state court prosecution against them was dismissed on March 26, 2012,

because they, "had been charged by federal authorities under the same facts as the

Commonwealth charges."  [R. 61-2].  The Office of the Attorney General certified the case for

federal prosecution on April 9, 2012 because, "the State has requested that the Federal

---

[2] The Motions to Dismiss were originally filed by Anthony Jenkins, but as the Court will grant David Jenkins's

Government assume jurisdiction, and because it is in the public interest and necessary to secure substantial justice." [R. 61-1]. The United States filed its Indictment against the Jenkinses on April 11, 2012, charging them with conspiring to kidnap Pennington in violation of 18 U.S.C. § 1201(c), kidnapping Pennington in violation of 18 U.S.C. § 1201, and willfully causing bodily injury to Pennington because of his actual or perceived sexual orientation in violation of 18 U.S.C. § 249(a)(2). Based primarily upon the latter of these charges, the Jenkinses have now raised four Motions to Dismiss.

## II.

Congress passed the Hate Crimes Prevention Act in 2009 and it has since been considered in a very limited number of cases across the county, including only once by the Sixth Circuit. See *Glenn v. Holder* 690 F.3d 417 (6th Cir. 2012) (concluding that two pastors did not have standing to challenge the constitutionality of the Act). The Jenkinses are charged under § 249(a)(2):

> **(2)** Offenses involving actual or perceived religion, national origin, gender, sexual orientation, gender identity, or disability.--
>
>> **(A) In general.**--Whoever, whether or not acting under color of law, in any circumstance described in subparagraph (B) or paragraph (3), willfully causes bodily injury to any person or, through the use of fire, a firearm, a dangerous weapon, or an explosive or incendiary device, attempts to cause bodily injury to any person, because of the actual or perceived religion, national origin, gender, sexual orientation, gender identity, or disability of any person--
>>
>>> **(i)** shall be imprisoned not more than 10 years, fined in accordance with this title, or both; and
>>>
>>> **(ii)** shall be imprisoned for any term of years or for life, fined in accordance with this title, or both, if--

---

motion for joinder in each of the motions to dismiss, the arguments shall be discussed as for both defendants.

          **(I)** death results from the offense; or

          **(II)** the offense includes kidnapping or an attempt to kidnap, aggravated sexual abuse or an attempt to commit aggravated sexual abuse, or an attempt to kill.

     **(B) Circumstances described.**--For purposes of subparagraph (A), the circumstances described in this subparagraph are that--

        **(i)** the conduct described in subparagraph (A) occurs during the course of, or as the result of, the travel of the defendant or the victim--

          **(I)** across a State line or national border; or

          **(II)** using a channel, facility, or instrumentality of interstate or foreign commerce;

        **(ii)** the defendant uses a channel, facility, or instrumentality of interstate or foreign commerce in connection with the conduct described in subparagraph (A);

        **(iii)** in connection with the conduct described in subparagraph (A), the defendant employs a firearm, dangerous weapon, explosive or incendiary device, or other weapon that has traveled in interstate or foreign commerce; or

        **(iv)** the conduct described in subparagraph (A)--

          **(I)** interferes with commercial or other economic activity in which the victim is engaged at the time of the conduct; or

          **(II)** otherwise affects interstate or foreign commerce.

**(b) Certification requirement.**--

     **(1) In general.**--No prosecution of any offense described in this subsection may be undertaken by the United States, except under the certification in writing of the Attorney General, or a designee, that--

        **(A)** the State does not have jurisdiction;

        **(B)** the State has requested that the Federal Government assume jurisdiction;

        **(C)** the verdict or sentence obtained pursuant to State charges left demonstratively unvindicated the Federal interest in eradicating bias-motivated violence; or

        **(D)** a prosecution by the United States is in the public interest and

necessary to secure substantial justice.

Though the HCPA is not the first piece of hate crime legislation, it does make substantial

changes to the predecessor statute, 18 U.S.C. § 245, including the addition of sexual orientation

as a basis of violation.

**A.**

**1.**

Why is this a Federal Crime?  After all, this type of violent act is exactly the kind of

crime traditionally prosecuted by state and local authorities.  What is it about this circumstance

that gives the Federal Government the power to hold these defendants accountable for these acts?

Traditionally, it is the Commerce Clause that answers the questions posed.  Congress, after all,

has the power to regulate the "channels of interstate commerce" and "persons or things in

interstate commerce," and even certain activities that "substantially affect interstate commerce."

*United States v. Lopez*, 514 U.S. 549, 558 (1995).  And it is these categories that deserve careful

attention before going any further.

In *Lopez*, the Supreme Court recognized that while the changing American economy had

led to a considerable broadening of the power provided Congress under the Commerce Clause,

"this power is subject to outer limits." *Lopez*, 514 U.S. at 556-57.  The Court seemed especially

concerned that the expanding power available under the Commerce Clause would encroach on

federalism to an extent that "would effectively obliterate the distinction between what is national

and what is local and create a completely centralized government." *Lopez*, 514 U.S. at 557

(quoting *NLRB v. Jones & Laughlin Steel Corp.* 301 U.S. 1, 37 (1995)), (quoted by *United States

v. Faasse*, 265 F.3d 475, 481 (6th Cir. 2001)).

To more clearly define these limits, the Court summarized its previous Commerce Clause

jurisprudence and set forth "three broad categories of activity that Congress may regulate under its Commerce Clause power." *Lopez*, 514 U.S. at 558. The Court articulated those categories as follows:

> First Congress may regulate the use of the channels of interstate commerce. Second, Congress is empowered to regulate and protect the instrumentalities of interstate commerce, or persons or things in interstate commerce, even though the threat may come only from intrastate activities. Finally, Congress' commerce authority includes the power to regulate those activities having a substantial relation to interstate commerce, i.e., those activities that substantially affect interstate commerce.

*Lopez*, 514 U.S. at 558-59 (internal citations omitted).

The *Lopez* Court began its analysis by determining which of the three categories of activity Congress was regulating in its passage of the Gun-Free School Zones Act, 18 U.S.C. § 922 (q)(1)(A) ("GFZA"). The GFZA proscribed the knowing possession of a firearm within a school zone. The Court quickly reasoned that because the GFZA did not regulate the use of channels of interstate commerce nor protect an instrumentality or thing in interstate commerce, it could not be sustained under the first two categories, and its constitutionality would be determined under the third, which asked whether the activities regulated had a substantial impact on interstate commerce. *Lopez*, 514 U.S. at 558-59.

This framework is further developed by *United States v. Morrison*, 529 U.S. 598, 609 (2001). *Morrison* used this three category analysis to review a statute regulating conduct substantially similar to that of the HCPA. Specifically, the Court considered the constitutionality of The Violence Against Women Act, 42 U.S.C. § 13981 ("VAWA"). The VAWA provides that, "a person . . . who commits a crime of violence motivated by gender . . . shall be liable to the party injured." The Court found that, "given [the VAWA]'s focus was on gender motivated

violence wherever it occurs (rather than violence directed at the instrumentalities of interstate commerce, interstate markets, or things or persons in interstate commerce) we agree that [the third category] is the proper inquiry." *Morrison*, 529 U.S. at 609. Therefore, as was the case in *Lopez*, the *Morrison* Court proceeded to analyze the law under the third category to determine whether the activities regulated had a substantial impact on interstate commerce.

The HCPA, like the VAWA in *Morrison,* falls under the Third Category. Though the VAWA provides a civil remedy to victims of gender motivated crime, at the core, both it and the HCPA are laws punishing bias-motivated violence. In addition, both laws regulate violent activity rather than channels or instrumentalities of interstate commerce. It is true that unlike the VAWA, HCPA § 245(a)(2)(B) contains a jurisdictional element that discusses channels and instrumentalities of interstate commerce. At oral argument, the Government proceeded as though the addition of this hook moved the HCPA into a Category One and Two analysis. While this argument is not *per se* incorrect, the case law does not suggest that the talismanic use of jurisdictional element language can transform a law otherwise regulating violent activity into a law regulating channels or instrumentalities of interstate commerce. The *Lopez-Morrison* framework takes a statute's jurisdictional element into consideration, but not at this point in the analysis. Instead, a the teaching of *Lopez* and *Morrison* is that the relevance of a jurisdictional element is not related to which category to apply, but to whether activities that are already classified under Category Three have been properly limited by Congress so as to only regulate activity having a substantial impact on interstate commerce. Though this distinction might not have a great deal of substantive impact on the outcome in this case, it is the analysis that most closely adheres to the *Lopez* framework. The HCPA is not a statute to regulate the roads or automobiles, but violent conduct. Regulation of violent conduct is a Category Three issue.

Therefore, like the laws in both *Lopez* and *Morrison*, for the HCPA to be a valid exercise of Congressional power, it must regulate an activity that substantially affects interstate commerce.

The framework for determining whether an activity has a substantial impact on interstate commerce was set forth in *Lopez* and again applied in *Morrison*. First, a reviewing court must determine whether the prohibited activity is economic in nature or an essential part of a larger regulation of economic activity. *Lopez*, 514 U.S. at 561; *Morrison*, 529 U.S. at 610. Second, the statute is reviewed to determine if it contains a jurisdictional element. *Lopez*, 514 U.S. at 561; *Morrison*, 529 U.S. at 611. Third, the court considers Congressional findings as to the effects of the prohibited activity on commerce. *Lopez*, 514 U.S. at 562; *Morrison*, 529 U.S. at 612. Finally, a determination must be made as to whether the link between the prohibited activity and the effect on interstate commerce is attenuated. *Lopez*, 514 U.S. at 562; *Morrison*, 529 U.S. at 612.

The first factor in determining whether the prohibited activity substantially affects interstate commerce is whether this activity is economic in nature or part of a larger regulatory scheme of economic activity. *Morrison* found that, "gender-motivated crimes of violence are not, in any sense of the phrase, economic activity." *Morrison*, 529 U.S. at 613. The Court stated that the conduct prohibited by the VAWA, like that the statute in issue in *Lopez*, was noneconomic and related to the punishment of crimes. *Id*. Though the Court recognized that, "in a sense any conduct in this interdependent world of ours has an ultimate commercial origin and consequence," conduct of the type in *Morrison* and *Lopez* were not sufficient to be considered inherently economic in nature. *Morrison*, 529 U.S. at 611. The conduct prohibited by the HCPA is bias-motivated violence, which is the same type of activity the Supreme Court in *Morrison* identified as noneconomic. As such, the HCPA likewise fails the first factor under the *Lopez-*

*Morrison* framework for measuring the substantiality of interstate commerce effect.

This outcome is not changed by the Supreme Court's subsequent decision in *Gonzales v. Raich*, 545 U.S. 1 (2005). In *Raich*, the Court considered an as-applied challenge to the federal Controlled Substances Act (CSA), as it related to the personal use marijuana. The Court again found that, "only the third category is implicated in the case at hand." *Id*. at 16. According to the Court the CSA was part of the Comprehensive Drug Abuse Prevention and Control Act, which "was a lengthy and detailed comprehensive framework for regulating the production, distribution, and possession of five classes of 'controlled substances.'" *Id*. at 24. The drug trade was found to constitute a significant interstate market, and thus the CSA and its larger regulatory framework were determined to govern economic activity. *Id*. Once the Court deemed the activity to be part of a larger regulatory scheme that was economic in nature, it held that Congress need only find a rational basis for concluding that local activities substantially affect interstate commerce. *Id*. at 22. Thus, even though the personal use of marijuana was totally intrastate, because it was proscribed by a statute that was part of a greater regulatory scheme which governed conduct that was economic in nature, the Court found that federal jurisdiction was appropriate under both *Lopez* and the Commerce Clause. *Id*. at 23.

The analysis in *Raich* has been used in this Circuit to find that statutes involving child pornography were constitutional under the Commerce Clause. In *United States v. Bowers*, 594 F.3d 522 (6th Cir. 2010), the defendant was charged under 18 U.S.C. §§ 2251(a) and 2252(a)(4)(B) for manufacture and possession of child pornography. He claimed that he produced pornography for non-commercial reasons and thus, as applied to him, the aforementioned statutes were unconstitutional. *Id*. at 527. However, the Sixth Circuit reasoned that, "there is no question Congress has a legitimate basis for attempting to regulate the interstate

market in child pornography and that the statutes that [the defendant] challenges are part of a larger comprehensive scheme to regulate that illicit interstate market." *Id.* at 528 (citing *United States v. Brown*, 327 Fed.App'x, 526, 532-33 (6th Cir. 2006)).  As a result, the Sixth Circuit stated that the relevant question was, "whether Congress had a rational basis for concluding that leaving home-consumed and produced child pornography outside of federal control would affect price and market condition of the larger interstate market that Congress was authorized to regulate, thus allowing it to criminalize wholly intrastate activity as part of its larger comprehensive scheme." *Id.* at 528 (citing *Raich*, 545 U.S. at 19).  The Court said "yes" and upheld that act.

Unlike the drug trade and illicit pornographic industry, the statutes at issue in *Lopez* and *Morrison* are clearly distinct from *Raich* because the activities that they regulate are not economic in nature or part of a larger regulatory scheme that is economic in nature.  As previously established, the Supreme Court has already determined that the conduct proscribed in the HCPA is non-economic.  Further, like *Lopez* and *Morrison*, the HCPA is a "brief, single-subject statute," addressing a particular type of violent conduct.  *Raich*, 545 U.S. at 23.  That stands in contrast to the "comprehensive regulatory statute" governing economic activity in *Raich*.  *Id.*  There is no significant economic market for bias-motivated crime, and there is no large regulatory structure of which the HCPA is a part.  Therefore, the HCPA fails the first measure of substantial effects test in that it is not economic in nature nor part of a regulatory scheme that is economic.

Additional factors used in determining whether the conduct prohibited by a statute substantially affects interstate commerce under the *Lopez-Morrison* framework are whether Congress has made findings as to the effect of the prohibited conduct on interstate commerce,

and whether the link between the activity and interstate commerce is attenuated. The *Morrison* Court analyzed these two factors together in determining that findings for the VAWA were insufficient and the link between bias-motivated crime and interstate commerce was too attenuated. 529 U.S. at 614. Specifically, the Court acknowledged that Congress had made findings that violent crime has a substantial effect on interstate commerce, but noted that while helpful, Congress' determination is not dispositive because the ultimate determination of this issue is for the judiciary. *Id.* And in *Morrison*, the judiciary did not agree with Congress' assessment that bias-motivated violence has a substantial effect on interstate commerce. *Id.*

The Supreme Court rejected congressional findings related to the high costs of violent crime that is spread throughout the population, that violent crime reduces the ability of people to travel and participate in commerce among states, and that violent crime damaged the productivity of the nation. *Id.* at 615. Though acknowledging there might be some truth to these findings, the Court rejected these "cost of crime" and "national productivity" arguments because "they would permit Congress to regulate not only all violent crime, but activities that might lead to violent crime, regardless of how tenuously they relate to interstate commerce." *Id.* at 613. The Court found that under this rationale there would be nothing Congress could not regulate, which would invade the traditional province of the state in areas like punishment of intrastate violence. *Id.* Therefore, the Court reasoned that Congress' findings that bias-motivated crime affected interstate commerce were inadequate because, in effect, the Court had already found the link between violent crime and interstates commerce to be too attenuated and no accumulation of findings would alter that flaw. *Id.*

Knowing this, it is easy to see that the HCPA does not contain adequate findings as to the affect the prohibited conduct had on interstate commerce, and the link between the activity and

interstate commerce is attenuated. The findings made by Congress to support the HCPA were substantially similar to the arguments made in *Lopez* and the findings advanced in *Morrison*. These types of findings were insufficient then and remain so now. Further, because *Morrison* expressly found the link between violent crime of the type prohibited by the HCPA and interstate commerce to be too attenuated, the HCPA cannot be said to regulate activity substantially affecting interstate commerce under this factor.

And though until this point, the analysis of the HCPA has directly tracked the analysis of the VAWA in *Morrison*, the laws are distinct. Unlike the VAWA, the HCPA contains a jurisdictional element. The final measure of whether a statute regulates activity that has a substantial impact on interstate commerce sufficient to support Commerce Clause jurisdiction is whether the statute contains such an element. *Lopez*, 529 U.S. at 561.

A jurisdictional element is a limiting factor contained in the statute that would ensure on a case-by-case basis that the activity regulated in a statute has the required nexus with interstate commerce. *Id*. at 562. Jurisdictional elements, often called "hooks," are inherently only sufficient to fulfill their purpose when they either limit the regulation to interstate activity or ensure that the interstate activity that is regulated falls within one of the three categories of congressional power. See *United States v. Rodia*, 194 F.3d 465, 472-73 (3rd Cir. 1999). Thus, in effect, the jurisdictional element returns the analysis to the Government's original argument that the jurisdictional hook works to limit activity regulated in the law to the kind of activity that Congress is empowered to regulate under *Lopez* Categories One and Two, which would ensure that it is the type of conduct that substantially affects interstate commerce. The jurisdictional element of the HCPA is codified in § 249(a)(2)(B):

   **(B)** Circumstances described.--For purposes of subparagraph (A), the circumstances

described in this subparagraph are that--

> **(i)** the conduct described in subparagraph (A) occurs during the course of, or as the result of, the travel of the defendant or the victim--

>> **(I)** across a State line or national border; or

>> **(II)** using a channel, facility, or instrumentality of interstate or foreign commerce;

> **(ii)** the defendant uses a channel, facility, or instrumentality of interstate or foreign commerce in connection with the conduct described in subparagraph (A);

> **(iii)** in connection with the conduct described in subparagraph (A), the defendant employs a firearm, dangerous weapon, explosive or incendiary device, or other weapon that has traveled in interstate or foreign commerce; or

> **(iv)** the conduct described in subparagraph (A)--

>> **(I)** interferes with commercial or other economic activity in which the victim is engaged at the time of the conduct; or

>> **(II)** otherwise affects interstate or foreign commerce.

From the face of the statute it is clear that Congress has employed the full breadth of its regulatory power to ensure that this jurisdictional hook is sufficient. The jurisdictional element in HCPA § 249(a)(2)(B) attempts to capture situations involving channels, facilities, and instrumentalities in interstate commerce; people, places, and things in interstate commerce; conduct substantially affecting interstate commerce; and any other activity of interstate commerce, but without capturing any conduct beyond these categories. Thus, in theory, this is the type of limiting factor that *Lopez* envisioned would provide "through a case-by-case" inquiry that the prohibited activity has the "requisite nexus to interstate commerce." 514 U.S. at 561-62. This is accomplished by including an element of the crime that if proven would ensure that the conduct was in a category of activity that was within the power of Congress to regulate.

To put that theory to the test, the aforementioned "case-by-case inquiry" discussed above must be applied to the facts of this case to see if the HCPA captures conduct beyond the reach of

Congress or is limited to activity that Congress is empowered to regulate under the Commerce Clause. The Jenkinses are charged under the HCPA for the willful infliction of a bodily injury to Michael Pennington because of his sexual orientation. This base situation would not be captured under the jurisdictional element of HCPA § 249(a)(2)(B). However, the Government alleges that the Jenkinses used a motor vehicle to secret Pennington via U.S. Highway 119 to the remote location where they beat him. In the Government's view, the use of the vehicle and the highway triggers the jurisdictional element of the statute because the Jenkinses used an instrumentality and channel of interstate commerce, which Congress has the power to regulate under the Commerce Clause.

The Sixth Circuit has held that "cars are themselves instrumentalities of commerce, which Congress may protect." *United States v. McHenry*, 97 F.3d 125, 126 (6th Cir. 1996) (quoting *United States v. Oliver*, 60 F.3d 547, 550 (9th Cir. 1995). In fact, motor vehicles have been described as "the quintessential instrumentalities of modern interstate commerce." *Id.* (quoting *United States v. Bishop*, 66 F.3d 569, 588-90 (3d Cir. 1995)). According to the *Lopez* Court, as an instrumentality, cars may be regulated and protected "even though the threat may come only from intrastate activities." 514 U.S. at 558. That has prompted this Circuit to find that instrumentalities of interstate commerce like cars are considered to "retain the inherent potential to affect commerce." *McHenry,* 97 F.3d at 127.

Thus, even though the Jenkinses never crossed state lines, their use of a car to secret Pennington to the place where they beat him triggers the "instrumentality of interstate commerce" jurisdictional element of the HCPA. And though the intrastate use of a truck to affect a violent act is seemingly attenuated from interstate commerce, precedent in this Circuit is clear that when Congress limits a law to cover activity effectuated with a motor vehicle, it is

inherently acting within its power to regulate the instrumentalities of interstate commerce.

Channels of commerce are "the interstate transportation routes through which persons and goods move [including] highways, railroads, navigable waters and airspace." *Morrison,* 529 U.S. at 613; *United States v. Faasse*, 265 F.3d 475, 490.  Hence, when the Jenkinses traveled to the location of the assault along U.S. Highway 119, they did so via a channel of interstate commerce.  Additionally, courts have determined that Congress has broad power to regulate channels of interstate commerce.  *See Brooks v. United States*, 267 U.S. 432, 436 (1925) ("Congress can certainly regulate interstate commerce to the extent of forbidding and punishing the use of such commerce as an agency to promote immorality, dishonesty, or the spread of any evil or harm to the people of other states from the state of origin."); *Faasse*, 265 F.3d at 490 (finding that Congress has the power to enact legislation concerning child support payments under its power to regulate channels of interstate commerce because even though the defendant never sent the payment, if he ever did it would by definition have to go through interstate commerce); *United States v. Ballinger*, 395 F.3d 1218, 1227 (11th Cir. 2005) ("Plainly, congressional power to regulate the channels and instrumentalities of commerce includes the power to prohibit their use for harmful purposes, even if the targeted harm itself occurs outside the flow of commerce and is purely local in nature.).  Though the intrastate use of a highway to affect a violent act also seems attenuated from interstate commerce, most courts conclude that when Congress limits its regulation to cover activity that involves the use of a channel of interstate commerce, like a highway, it is inherently acting within its power to regulate interstate commerce.

The statutes in *Lopez* and *Morrison* did not contain a jurisdictional element, and thus, having failed every measure of substantial interstate commerce effect, both were deemed

unconstitutional exercises of Commerce Clause authority and were struck down by the Supreme Court. Despite its failure under every other factor of the *Lopez-Morrison* analysis, the HCPA does contain a jurisdictional element and this hook does appear to be sufficient to capture the facts in this case.

The question remains whether constitutional salvation is available to an otherwise deficient law by a sufficient jurisdictional hook alone? The Sixth Circuit has recently answered this question in the affirmative, stating, "where a statute lacks a clear economic purpose, the inclusion of an explicit jurisdictional element suffices to ensure, through case-by-case inquiry, that the violation in question affects interstate commerce." *United States v. Coleman*, 675 F.3d 615, 620-21 (6th Cir. 2012). By including a sufficient jurisdictional element, Congress provides a limiting factor to ensure that in a case-by-case inquiry the statute sweeps no broader than the categories of activity that Congress is empowered to regulate under the Commerce Clause.

It is also worth noting that this Court is not alone in reaching this conclusion. The only other court to consider this issue upheld the HCPA as constitutional under the Commerce Clause using the same rationale. In *United States v. Mullett*, 2012 WL 2330905, at *3 (N.D.Ohio May 31, 2012), the court stated, "The statute requires the Government to allege and prove beyond a reasonable doubt a *jurisdictional nexus*, establishing an explicit connection between the prohibited conduct and interstate commerce." (Emphasis added). The court also found that, "incorporating a jurisdictional element into the offense has traditionally saved statutes from Commerce Clause challenges." *Id.* In applying this principle to the facts in that case, the court recognized that the indictment alleged that the defendants used a weapon in interstate commerce and in addition, "lured the victim by using the mail system and used motor vehicles to facilitate each assault, establishing the jurisdictional element at Section 249(a)(2)(B)(ii)." *Id.* As a result,

the court concluded, as this Court does, that "the Hate Crime Prevention Act is constitutional on its face and as applied here." *Id*.

And while the HCPA can be found to meet the tests set forth in *Lopez*, it is difficult to argue that it furthers the purpose of limiting the federal Commerce Clause power so that it does not "obliterate the distinction between what is national and what is local" and restraining the federal government from encroaching on the areas that have been reserved to State. 514 U.S. 557. The Jenkinses perpetrated an assault, which is a non-economic activity that constitutes a crime traditionally in the province of an individual state's police powers to punish. However, to get to the location of the crime, they drove their car over a U.S. Highway, which is built and maintained by the state. It should be noted that the Jenkinses never used the car or the road to leave the state. They drove a few miles to a state park, and only when they arrived – off of the highway and out of the vehicle – did they engage in the conduct of the hate crime. However, unbeknownst to the Jenkinses, having never set foot outside of the state and having engaged in a violent activity without any relationship to commerce, they had trespassed a federal law with its jurisdiction supported by the Interstate Commerce Clause.

If wholly intrastate non-economic activity can be transformed into conduct that the federal government may punish simply because the defendant used a car or a road to get there, the Interstate Commerce Clause continues to cast a very large shadow, indeed, and very little activity remains in the exclusive province of the police powers of the state. Even so, this is the ultimate outcome of the current prevailing constitutional precedents in this Circuit as applied to these facts. Therefore, as the HCPA § 249(a)(2) regulates activity that is within the power of Congress under the Interstate Commerce Clause, federal jurisdiction is appropriate under this statute generally and as applied to this case.

**2.**

There is another section of the HCPA, challenged by the Jenkinses, that seeks to address

federalism concerns.  This provision, HCPA § 249(b)(1), states that:

> **(1)** In general.--No prosecution of any offense described in this subsection may be
> undertaken by the United States, except under the certification in writing of the Attorney
> General, or a designee, that--
>
>> **(A)** the State does not have jurisdiction;
>>
>> **(B)** the State has requested that the Federal Government assume jurisdiction;
>>
>> **(C)** the verdict or sentence obtained pursuant to State charges left demonstratively
>> unvindicated the Federal interest in eradicating bias-motivated violence; or
>>
>> **(D)** a prosecution by the United States is in the public interest and necessary to
>> secure substantial justice.

One of the stated purposes of this requirement was to, "ensure the federal government will assert

its new hate crimes jurisdiction only in a principled and properly limited fashion."  H.R.No. 86,

111th Cong., 1st Session 5, 14 (2009).

The Attorney General certified this case for federal prosecution pursuant to HCPA §

249(b)(1).  [R. 61-1].  The Jenkinses assert that this Court should engage in a substantive review

of the certification process to determine if the federal government is rightly involved in this case.

"Judicial review of executive action 'will not be cut off unless there is a persuasive reason to

believe that such was the purpose of Congress.'" *United States v. Doe*, 226 F.3d 672, 676 (6th

Cir. 2000) (quoting *Gutierrez de Martinez v. Lamagno*, 515 U.S. 417, 424 (1995)).  Even so, the

Government still retains "broad discretion" as to whom to prosecute and what charges to bring

against them. *Wayte v. United States*, 470 U.S. 598, 609 (1985).  The decision to prosecute is ill-

suited for judicial review because, "the strength of the case, the prosecutor's general deterrence

value, the Government's enforcement priorities, and the case's relationship to the overall

enforcement plan are not readily susceptible to the kind of analysis the courts are competent to make." *Id.* Thus, in determining whether substantive review of the Attorney General's decision to certify the prosecution is appropriate, it must be determined whether Congress intended for the general presumption in favor of judicial review to give way to the traditional deference given to prosecutorial discretion.

Though the Jenkinses concede that the Sixth Circuit has not considered the certification issue in the context of HCPA § 249(b)(1), they state that the Fourth Circuit has permitted review of a similar certification requirement for the prosecution of a juvenile defender as an adult under 18 U.S.C. § 5032. And though the Defendants are correct that the Fourth Circuit did make such a ruling in *U.S. v. Juvenile Male #1*, 86 F.3d 1314, 1317 (4th Cir. 1996), it does not bind this Court. In contrast, ten other circuits have reached the opposite conclusion, including the Sixth Circuit, which is binding. *United States v. Doe*, 226 F.3d 672, 676 (6th Cir. 2000). In *Doe*, the Sixth Circuit agreed with "the overwhelming majority of the circuit courts which have held that the clear implication of § 5032 is that the Attorney General's certification of a substantial federal interest is a non-reviewable act of prosecutorial discretion." *Id.* at 678. The court reached that conclusion first on the text of the statute itself, which merely stated that the Attorney General was to "certify" that there is a "substantial federal interest in the case or offense." *Id.* Had Congress wanted district court review of the certification, the court reasoned, it was capable of articulating this as it had done in other statutes. Additionally, the Sixth Circuit found that a lack of a standard of review supported the notion that Congress intends no review to be available. The court concluded that these textual inferences "coupled with the traditional deference afforded by courts to prosecutorial decision-making, overcome the general presumption in favor of judicial review of executive action." *Id.* Thus, the Sixth Circuit prohibited substantive review

of the Attorney General's certification under § 5032.

For the same reasons, judicial review of the Attorney General's certification under HCPA § 249(b)(1) is inappropriate. Like § 5032, HCPA § 249(a)(2) simply requires that the Attorney General provide "certification in writing" of one of the four listed grounds. The statute is devoid of any provision for judicial review or a standard of review under which such a review could be conducted. Therefore, the text of the statute indicates Congress intended that judicial review of the certification process should be precluded in favor of the broad discretion of federal prosecutors. As a result, this Court may not engage in a substantive review of the prosecution's certification.

The Jenkinses also claim the Attorney General did not follow the proper procedure in certifying this case for prosecution. The certification of the Attorney General states that, "the State has requested that the Federal Government assume jurisdiction and because it is in the public interest and necessary to secure substantial justice." [R. 61-1]. Both of these are suitable grounds for prosecution under HCPA § 249(b)(1), though only one such ground is required.

Prior to certification, state charges had been filed against Anthony Jenkins, but were dismissed by the Commonwealth because "the Commonwealth [was] advised that the above named defendant has been charged by the federal authorities under the same facts as the Commonwealth." [R. 61-2]. The Jenkinses claim that this order of dismissal from state court demonstrates that the Commonwealth did not request that the federal authorities assume jurisdiction, and the certification for federal prosecution is procedurally flawed on that ground. However, any procedural ambiguity that might have been caused by the state court order of dismissal was resolved by the August 8, 2012 letter from the Commonwealth's Attorney in which he states that on October 13, 2011 he requested that the Attorney General's office pursue

the Jenkinses' cases in federal court. In demonstrating that the State requested the United States to assume authority, the Government has done enough to show that it satisfied the procedural requirements of § 249(b)(1). Beyond that, as previously discussed, the certification process used by the Government is not reviewable and the Jenkinses' motion to dismiss on this basis will therefore be denied.

**B.**

**1.**

The Jenkinses next argue that on its face § 249(a)(2) creates special protection for a class of individuals based on the victim's sexual orientation, which violates the equal protection component of the Fifth Amendment to the United States Constitution. The Supreme Court has found the guarantee of equal protection under the law to be inherent in the due process that is secured in the Fifth Amendment. That applies to the federal government via the same analysis that the Equal Protection Clause of the Fourteenth Amendment applies to the states. *United States. v. Baker,* 197 F.3d 211, 216 (6th Cir. 1999) (citing *Buckey v. Valeo*, 424 U.S. 1, 93 (1976)). The equal protection guarantee is a recognition that the Constitution "neither knows nor tolerates classes among citizens," but instead demonstrates a "commitment to the law's neutrality where the rights of persons are at stake." *Romer v. Evans*, 517 U.S. 620, 623 (1996) (citing *Plessy v. Ferguson*, 163 U.S. 537, 559 (1896) (Harlan, J., dissenting)). Legislative measures challenged for violating equal protection have traditionally been measured under a tripartite test, which considers whether the enactment uniquely disables any suspect class or quasi-suspect class, or creates a classification that invades any person's fundamental rights. *Equality Foundation of Greater Cincinnati, Inc. v. City of Cincinnati*, 128 F.3d 289, 292 (6th Cir. 1997).

It is not necessary to discuss which level of scrutiny HCPA § 249(a)(2) is subject to

under the tripartite test of equal protection because the law creates no classifications among

citizens, but is neutral on its face.  HCPA § 249(a)(2)'s protections extend to *any person* who is

the victim of bodily injury on the basis of his or her sexual orientation.  By its terms, this statute

does not provide preferential treatment only to homosexuals, but instead provides equal

protection to people of all sexual orientations, which would include heterosexuals.  As the HCPA

§ 249(a)(2) does not create classes of citizens, but provides neutral protection for all people, it

does not give rise to any equal protection concerns on its face.  At least one court agrees, having

considered an equal protection challenge in conjunction with this statute, albeit under §

249(a)(1), and reaching the same conclusion.  *United States. v. Beebe*, 807 F.Supp.2d 1045. 1058

(D.N.M. 2011) ("Because the statute addresses this race-related issues in a racially neutral

manner, it raises no equal protection issue.") (citing *Crawford v. Bd. of Educ.*, 458 U.S. 527, 538

(1982)).

The Jenkinses' unsupported suggestion that the law merely uses clever wording to

disguise a discriminatory intent does not change this conclusion.   When a facially neutral rule is

challenged on equal protection grounds, the one challenging the law must show that it was

enacted "because of," not merely "in spite of," its adverse impact on persons in plaintiff's class.

*United States v. Johnson*, 40 F.3d 436, 439 (D.C. Cir. 1994) (citing *Personnel Adm'r v. Feeney*,

442 U.S. 256, 256 (1979)).  The Jenkinses accuse Congress of passing this discriminatory law to

harm heterosexuals; however, they advance no evidence in support of this claim.  Congress

found, for example, that in 2007 the FBI documented more than 1,265 incidents of hate crimes

motivated by bias based upon sexual orientation.  H.R. Rep. No. 86, 111th Cong.. 1st Session. Pt.

1 at 5 (2009).  It is more likely that Congress sought to address this issue than to craft some

legislation with the purpose of adversely impacting heterosexuals.  In the end, this Court need

not speculate. Failing to demonstrate that the HCPA creates an impermissible class or is based on discriminatory intent, the Jenkinses' facial equal protection challenge will fail.

## 2.

The Jenkinses next argue that the HCPA § 249(a)(2) violates the substantive due process component of the Fifth Amendment. Substantive due process provides "heightened protection against government interference with certain fundamental rights and liberty interests." *Washington v. Glucksburg*, 521 U.S. 702, 720 (1997) (quoted by *Does v. Munoz*, 507 F.3d 961, 964 (6th Cir. 2007); *Seal v. Morgan*, 229 F.3d 567, 574 (6th Cir. 2000)). The Supreme Court has recognized a limited number of fundamental rights and identifying a new one is "an uphill battle" because "the list of fundamental rights is short." *Does*, 507 F.3d at 964. Though it is not altogether clear the basis of their substantive due process argument, the Defendants seem to claim a special fundamental right of liberty at stake in the prosecution of HCPA § 249(a)(2). However, as the United States correctly counters, "The Defendants' argument cannot be valid because in *all* criminal prosecutions the defendant's liberty is at stake, and criminal statutes are not per se subject to strict scrutiny. *See, e.g. United States v. Baker*, 197 F.3d 211, 216 (6th Cir. 1999) (rejecting defendant's contention that strict scrutiny applied to 18 U.S.C. § 922(g)(8))." [R. 70 at 11]. HCPA § 249(a)(2) does place the Jenkinses' liberty at risk, but no more so than the charged kidnapping statutes or any other criminal law. Thus, because the Jenkinses have shown no fundamental right being burdened by HCPA § 249(a)(2), their substantive due process challenge, like their equal protection challenge, will be denied.

## C.

Resting on the protections of the First Amendment, the Jenkinses next contend that the HCPA § 249(a)(2) is overbroad and void for vagueness. When a facial overbreadth challenge is

raised "a court must fist determine whether the regulation reaches a substantial amount of constitutionally protected conduct." *Leonardson v. City of East Lansing*, 896 F.2d 190, 195 (6th Cir. 1990) (citing *Houston v. Hill*, 482 U.S. 451, 458 (1987)). If the law does not encroach on a substantial amount of constitutionally protected conduct, the challenge must fail. *Village of Hoffman Estates v. Flopside, Hoffman Estates, Inc.*, 455 U.S. 489, 494-95 (1982).

Simply put, the HCPA reaches no constitutional conduct restricted by the First Amendment. The conduct that the HCPA § 249(a)(2) prohibits is "willfully caus[ing] bodily injury." The definitions are clear that "bodily injury" must be an actual physical injury, with emotional or psychological harm being insufficient. 18 U.S.C. § 249(c)(1). Violence is not constitutionally protected conduct. *N.A.A.C.P. v. Claiborne Hardware Co*., 458 U.S. 886, 916 (1982) ("Certainly violence has no sanctuary in the First Amendment, and the use of weapons, gunpowder, and gasoline may not constitutionally masquerade under the guise of advocacy."). The Jenkinses' argument that the protected conduct is the right to receive equal protection under the law is similarly unavailing. Even if the right to receive equal protection under the law could be classified as "constitutionally protected conduct," as previously discussed, the law is neutral and does not encroach upon any equal protection rights.

If the overbreadth challenge fails, courts next consider any facial vagueness challenges and "should uphold the challenge only if it is impermissibly vague in all its applications." *Village of Hoffman*, 455 U.S. 494-95, *see also United States. v. Pierce*, 1990 WL 201394, at *3 (6th Cir. Dec. 13, 1990); *Condon v. Wolfe*, 310 Fed. App'x, 807, 820-21 (6th Cir. 2009). "A plaintiff who engages in some conduct that is clearly proscribed cannot complain of the vagueness of the law as applied to others." *Village of Hoffman, 455* U.S. at 495.

The Jenkinses suggest that in § 249(a)(2) the phrase "actual or perceived . . . sexual

orientation" is so vague that the statute should be voided.  According to the claims made by the United States, the Jenkinses knew that Pennington was gay, they had seen him engage in conduct that would suggest he was gay, and then they assaulted him while shouting gay slurs.  Regardless of whatever else these words of § 249(a)(2) mean, they must at least give rise to the meaning that one cannot assault someone because he is gay without being subject to the HCPA.  Because the Jenkinses alleged conduct falls squarely within the meaning of the statute, they may not generally complain of its vagueness.

Even though this case does not involve constitutional conduct, the Sixth Circuit has recognized that courts may still engage in the stricter vagueness facial challenge analysis where the enactment imposes criminal sanctions.  *Belle Maer Harbor v. Charter Tp. of Harrison*, 170 F.3d 553, 559 (6th Cir. 1999).  To withstand a facial challenge under this stricter test, "an enactment must define the proscribed behavior with sufficient particularity to provide a person of ordinary intelligence with reasonable notice of the proscribed conduct and to encourage non-arbitrary enforcement of the provision."  *Id*.  Vagueness within a statutory enactment is not permissible so as to ensure that people can know what is prohibited and act accordingly and so that arbitrary and discriminatory enforcement of a law is prevented.  *Grayned v. City of Rockford*, 408 U.S. 104, 108-09 (1972).  Statutes are not unconstitutionally vague merely because they do not define all of their terms, but in absence of a clear definition, the "common meaning of the words must provide both adequate notice of the conduct prohibited and of the standards for enforcement."  *Belle Maer Harbor*, 170 F.3d at 558.

The Jenkinses claim that men of ordinary intelligence cannot understand what it would mean to willfully cause bodily injury to someone because of "actual or perceived sexual orientation."  In support, the Jenkinses provide an internet search that reveals as many as 30

25

different categories of sexual orientation, proving the term to be so broad that no person would be able to know what was being prohibited. It may be true that, "condemned to words, we can never expect mathematical certainty from our language." *Grayned,* 408 U.S. at 110. However, as the Government urges, Merriam-Webster's dictionary defines "sexual orientation" succinctly as "the inclination of an individual with respect to heterosexual, homosexual, and bisexual behavior." *Merriam-Webster's Dictionary* available at http://www.merriam-webster.com/medical/sexual%20orientation. This simple definition demonstrates that the term "sexual orientation" is not as complex or mysterious in the common vernacular as the Jenkinses suggest.

Additionally, the Sixth Circuit has considered an enactment containing the words "sexual orientation" without finding that it was too nebulous for comprehension. *Equality Foundation of Greater Cincinnati, Inc.*, 128 F.3d at 292. In short, the words of HCPA § 249(a)(2) convey in common language sufficient notice of the conduct that has been prohibited, and it cannot be voided for vagueness on that ground.

The Jenkinses next assert that § 249(a)(4)'s admonition to the Attorney General to establish "neutral and objective" criteria for determining whether a crime was committed because of the "actual or perceived" status of a person permits too much discretion for those enforcing the law. There are two fatal flaws in this argument. First, the "perception" that matters under the statute is that of the person committing the bodily injury, not the perception of the one enforcing the law. Adding "perceived" to the statute impermissibly delegates no one additional authority, but merely operates to protect a victim who, for example, was assaulted by someone believing him to be a homosexual, when in fact he maintained a different sexual orientation. Second, prosecutors have, "great discretion in determining whether or not to

26

prosecute and what charge to file so long as there is probable cause to believe an offense has been committed." *United States v. Davis*, 15 F.3d 526, 529 (6th Cir. 1994) (citing *United States v. Allen*, 954 F.2d 1160, 1166 (6th Cir. 1994)). Thus, as the Government correctly highlights, the statute's requirement that the Attorney General provide "neutral and objective" criteria for determining whether a crime was due to the "actual or perceived" status of any person actually helps to curtail the otherwise broad prosecutorial discretion, as opposed to expanding it as alleged by the Jenkinses.

In short, HCPA § 249(a)(2) is neither overbroad nor void for vagueness. The statute covers no protected constitutional conduct and the Jenkinses fall within the clear bounds of the statute. Even when viewing the language of the statute under a stricter test, the words "actual or perceived sexual orientation" are sufficient to put a person of average intelligence on notice of the prohibited conduct under this Act. Finally, the requirement that the Attorney General provide "neutral and objective" standards for determining "actual or perceived" status does not allow for unlimited discretion, but narrows the already sizeable discretion that prosecutors enjoy. Thus, the Jenkinses' second Motion to Dismiss will be denied.

**D.**

Finally, the Jenkinses argue that because the proof necessary to convict them on the kidnapping charges of the indictment is the same proof necessary to prove a portion of the elements of the HCPA § 249(a)(2) charge, the indictment is multiplicitous and therefore violative of the Double Jeopardy Clause of the Fifth Amendment. The Double Jeopardy Clause of the United States Constitution prohibits the government from putting any person twice, "in jeopardy of life or limb" for the same event. U.S. Const. amend V. Multiplicity occurs when a defendant is charged for a single offense in multiple counts in an indictment, which raises the danger of

either being punished twice or unfairly suggesting that more than one crime has been committed. *United States v. Swafford*, 512 F.3d 833, 844 (6th Cir. 2008).

Though a defendant may not be punished for the same event twice, "a single transaction can give rise to distinct offenses under separate statutes without violating the Double Jeopardy Clause." *United States v. Dudek*, 657 F.3d 424, 427 (6th Cir. 2011). In such a case, the court must first attempt to determine whether Congress intended that multiple punishments be imposed for the same crime. When the legislative intent is not altogether clear, courts then must turn to the *Blockburger* test, which looks to "whether each provision requires proof of a fact which the other does not." *Swafford*, 512 F.3d at 844 (citing *Blockburger v. United States*, 284 U.S. 299, 304 (1932)). Moreover, the focus of the test is not on the actual evidence to be presented at trial or the facts alleged in a particular indictment, but the proof necessary to prove the statutory elements of each offense. *Pandelli v. United States*, 635 F.2d 533, 538 (6th Cir. 1980) (citations omitted).

The Jenkinses claim that the kidnapping charges brought against them by the United States are included in HCPA § 249(a)(2), and therefore the Government should not be able to bring both charges under the Double Jeopardy Clause. HCPA § 249(a)(2)(A) that:

> **(A) In general.**—Whoever . . . willfully causes bodily injury to any person . . . because of the actual or perceived religion, national origin, gender, sexual orientation, gender identity, or disability of any person--
>
>> **(i)** shall be imprisoned not more than 10 years, fined in accordance with this title, or both; and
>>
>> **(ii)** shall be imprisoned for any term of years or for life, fined in accordance with this title, or both, if--
>>
>>> **(I)** death results from the offense; or
>>>
>>> **(II)** the offense includes kidnapping or an attempt to kidnap, aggravated sexual abuse or an attempt to commit aggravated sexual abuse, or an

attempt to kill.

The contention of the Jenkinses lies specifically in § 249(a)(2)(A)(ii)(II), which provides for a larger sentence "if the offense includes kidnapping." That the intention of Congress is not clear from the face of the statute or any accompanying legislative history is highlighted by the fact that both parties suggest that their proposed meaning was intended by Congress. The United States argues that "Congress intended to punish kidnapping and hate crimes separately," while the Jenkinses imply that Congress did not.

If the double jeopardy question cannot be answered by the legislative intent of the statutes, it must be solved by comparing the elements of each offense using the *Blockburger* test framework. As to Count Three, for the Jenkinses to be convicted of a hate crime under HCPA § 249(a)(2), the United States would be required to prove: (1) the defendants willfully caused bodily injury to Pennington; (2) because of Pennington's actual or perceived sexual orientation; and (3) that the conduct occurred using a channel of interstate commerce [as required by § 249(a)(2)(B)(i)(II)]. As to Count Two, for the Jenkinses to be convicted under 18 U.S.C. § 1201, the United States must prove that they: (1) knowingly and willfully seized confined, decoyed, inveigled, kidnapped, abducted, or carried away Pennington; (2) for some benefit or reason; (3) using any means or instrumentality of interstate commerce. Finally, as to Count One, for the Jenkinses to be convicted under 18 U.S.C. § 1201(c), the United States must prove that they conspired to violate the aforementioned kidnapping statute and one or more of them engaged in an overt act to bring about the object of the conspiracy. When comparing the basic elements required for a conviction, it is clear that no double jeopardy violation exists. To be convicted under § 249(a)(2), bodily injury is required, but not a kidnapping; while to be convicted under § 1201, a kidnapping or conspiracy to kidnap is required, but not bodily injury.

The Jenkinses argue that because the indictment indicates that the United States intends to secure a longer sentence by showing that a kidnapping was involved with the commission of the hate crime, this Court should also consider the aggravator of § 249(a)(2)(A)(ii)(II) to be a substantive element of the offense for the *Blockburger* analysis. The Jenkinses claim that to secure a sentence greater than ten years, the Government would also have to prove that "offense includes kidnapping." Under their logic, with this language included as a substantive element of the HCPA, if the Government proved the elements of § 249(a)(2), there would be no additional elements to prove for the other counts, making them multiplicitous. The Jenkinses conclude that as a result of this multiplicity they will be prejudiced before the jury.

Several flaws exist in the Jenkinses' rationale. First, as previously mentioned, the focus of the test is not on the actual evidence to be presented at trial or the facts alleged in a particular indictment, but the proof necessary to prove the statutory elements of each offense. The indictment does suggest that the United States intends to show that the hate crime offense was in conjunction with a kidnapping, which would provide for the availability of a longer sentence; but the Jenkinses can be convicted under § 249(a)(2) without any showing of kidnapping. Further, the Jenkinses can have their sentence enhanced under § 249(a)(2)(A)(ii)(II) without any showing of a kidnapping. The statute provides for such an enhancement if death results or the offense includes aggravated sexual abuse, an attempt to commit aggravated sexual abuse, or an attempt to kill. Even if the specific facts in the indictment were relevant to this analysis, the indictment clearly alleges that the Jenkinses attempted to kill Pennington. Thus, if the United States failed to prove that a kidnapping occurred, it could still successfully prove that the Jenkinses committed a hate crime qualifying for a sentence longer than ten years under § 249(a)(2)(A)(ii)(II). Therefore, under the *Blockburger* test, the counts of the indictment are not

inherently multiplicitious and do not violate the Double Jeopardy clause of the Fifth Amendment by prejudicing the Jenkinses before the jury.

## III.

Having considered the arguments of both parties and the Court being sufficiently advised, it is hereby **ORDERED** as follows:

(1) Defendant David Jenkins's Motion for Joinder [R. 64] in Anthony Jenkins's First, Second, Third, and Fourth Motions to Dismiss is **GRANTED**;

(2) The Defendants' First Motion to Dismiss [R. 53] is **DENIED**;

(3) The Defendants' Second Motion to Dismiss [R. 57] is **DENIED**;

(4) The Defendants' Third Motion to Dismiss or Alternative Schedule a Hearing for "Substantive" Review [R. 61] is **DENIED**;

(5) The Defendants' Fourth Motion to Dismiss [R. 62] is **DENIED**.

(6) The Defendants' October 15, 2012 Oral Motion to Dismiss is **DENIED**.

This 15th Day of October, 2012.



**Signed By:**

*Gregory F. Van Tatenhove*

**United States District Judge**